Martin J. Brill (admitted pro hac vice)
Philip A. Gasteier (admitted pro hac vice)
Beth Ann R. Young (admitted pro hac vice)
Krikor J. Meshefejian (admitted pro hac vice)
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile:  (310) 229-1244
Email:    mjb@lnbyb.com
          pag@lnbyb.com
          bry@lnbyb.com
          kjm@lnbyb.com

David Leta (1937)
Jeff Tuttle (14500)
**SNELL & WILMER L.L.P.**
1500 W South Temple, Suite 1200
Salt Lake City, UT 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
Email:    dleta@swlaw.com
          jtuttle@swlaw.com

*Counsel for Liquidation Trust of CS Mining, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC** <br><br> Debtor <br><br> LIQUIDATION TRUST OF CS MINING, LLC, <br> Plaintiff, <br> v. <br><br> CLARITY MANAGEMENT, L.P.; and EMPIRE ADVISORS, LLC <br><br> Defendants. | Bankruptcy Case No. 16-24818 <br><br> (Chapter 11) <br><br> Judge William T. Thurman <br><br> Adv. Pro. No.: <br><br> COMPLAINT FOR: <br><br> (1) BREACH OF CONTRACT; <br><br> (2) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; <br><br> (3) BREACH OF FIDUCIARY DUTY; <br><br> (4) EQUITABLE SUBORDINATION; AND <br><br> (5) DISALLOWANCE OF CLAIMS |

Plaintiff, the Liquidation Trust of CS Mining, LLC ("**Plaintiff**" or "**Liquidation Trust**"), hereby brings this adversary proceeding against defendants Clarity Management, L.P. ("**Clarity**"), and Empire Advisors, LLC ("**Empire**" and together with Clarity, "**Defendants**") and alleges as follows:

## I.

## NATURE OF ACTION

1.     On April 6, 2018, the Court entered the *Order Confirming Debtor's First Amended Combined Disclosure Statement And Chapter 11 Plan Of Liquidation* [Main Case Docket No. 1281] confirming the *Debtor's First Amended Combined Disclosure Statement And Chapter 11 Plan Of Liquidation* [Main Case Docket No. 1262] (the "**Plan**").  On April 17, 2018, the Plan became effective.

2.     Pursuant to the Plan, a Liquidation Trust was created and took all rights, title and interest in the remaining assets of CS Mining, LLC ("**Debtor**" or "**CSM**"), including, but not limited to, Debtor's claims and causes of action against Defendants.

3.     This is an action seeking the imposition of damages against Defendants, and each of them, for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and disallowance of Defendants' claims, as a consequence of actions taken by Defendants and directions given by Defendants to managers of the Debtor, as further described in detail herein.

4.     This action also seeks, to the extent not disallowed, to equitably subordinate all of Defendants' claims, including administrative claims, filed in Debtor's bankruptcy case.

## II.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter which is a core proceeding pursuant to

28 U.S.C. § 157(b)(1) and (2)(B) and (O) and pursuant to § 157(c)(1) because the causes of action

set forth herein are related to the bankruptcy proceeding.  Plaintiff consents to an entry of final

order or judgment on the non-core matters by this Court pursuant to 28 U.S.C. § 157(c)(2).

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## STATEMENT OF RELEVANT FACTS

**A.      Background Information.**

7.      On June 2, 2016 (the "**Involuntary Petition Date**"), R.J. Bayer Professional

Geologist, LC, Minerals Advisory Group, LLC, Rollins Construction & Trucking, LLC, Rollins

Machine, Inc., and Oxbow Sulphur, Inc. (collectively, the "**Petitioning Creditors**") filed an

involuntary Chapter 11 petition against Debtor with the United States Bankruptcy Court for the

District of Utah, Central Division (the "**Court**"). On August 4, 2016, the Court entered an order

for relief [Docket No. 130].

8.      The Petitioning Creditors filed Debtor's involuntary bankruptcy case in order to

maintain the going concern value of Debtor so that it could either reorganize or sell its assets for

the best price possible. Debtor utilized the Chapter 11 case to consummate a sale of substantially

all of Debtor's assets (excluding cash and causes of action) for the benefit of creditors.  On August

18, 2017, the Court authorized and approved, through the entry of its Order entered August 18,

2017, at Docket No. 895, Debtor's sale of substantially all of its mining and operating assets to

Tamra Mining Company, LLC (the "**Sale**").  Debtor closed on the Sale on August 28, 2017.

B.        **Relevant Individuals and Entities**

9.        Prior to the Sale, Debtor was owned by three members, all of whom were parties to the Limited Liability Company Agreement of CS Mining, LLC, dated as of October 31, 2011, and amendments thereto (together, the "**Operating Agreement**").

10.        The members of Debtor are: (i) Skye Mineral Partners, LLC ("**SMP**"), a Delaware limited liability company; (ii) Robert Reynolds, as representative of the First Lien Lenders under that certain Equity Administration Agreement by and among the former first lien lenders of Western Utah Copper Company ("**WUCC**") and Copper King Mining Corporation ("**CKMC**"), dated June 6, 2011; and (iii) CKMC.

11.        SMP was the majority controlling member of Debtor, owning approximately 94% of the common membership units of CSM, 100% of the preferred membership units of CSM, and 99.25% of the total membership units of the CSM.  CKMC owned approximately 1% of the common units and 0.12% of the overall units of the Debtor.   Robert Reynolds owned approximately 5% of the common units and 0.62% of the overall units of the Debtor.

12.        SMP is, in turn, owned by four members – Sky Mineral Investors, LLC ("**SMI**"), Clarity Copper, LLC ("**Clarity Copper**"), DXS Capital (U.S.) Limited ("**DXS**"), and PacNet Capital (U.S.) Limited ("**PacNet**").  SMI and Clarity Copper are affiliates of Debtor, by virtue of their directly or indirectly holding 20% or more of the voting securities of Debtor.

13.        Pursuant to Section 5.1 of CSM's Operating Agreement, at all relevant times, CSM's business and affairs were managed by a Board of Managers (the "**CSM Board**").

14.        On or about October 31, 2011, Debtor, on the one hand, and Defendants, on the other hand, entered into a letter agreement (the "**Letter Agreement**"), pursuant to which, among other things, "[Debtor] hereby retains [Defendants] to provide or cause to be provided, as mutually agreed by [Defendants] and the board of managers of [Debtor], service on, and advice to the board

of management and the management of the [Debtor] regarding corporate and financial strategy, potential acquisitions and divestitures, the financial management of [Debtor] and other initiatives." A true and correct copy of the Letter Agreement is attached as Exhibit "1" to this Complaint. Defendants breached the Letter Agreement in multiple respects, as set forth herein.

15.     The Letter Agreement provides that it "will terminate immediately upon the earliest to occur of: (i) 30 days written notice by the Advisor of its intention to terminate this Agreement; (ii) the closing of the Company's initial firmly underwritten public offering of securities pursuant to an effective registration statement filed under the Securities Act of 1933, as amended; or (iii) the liquidation, dissolution, or winding up of the Company; or (v) the date on which no Investor owns any securities or other interests in the Company."

16.     The Letter Agreement created a fiduciary relationship between Defendants and Debtor and, in connection therewith, Defendants owed fiduciary duties to Debtor under the Letter Agreement.

17.     The Letter Agreement terminated as of the Involuntary Petition Date.  If it did not terminate as of the Involuntary Petition Date, then it terminated when the order for relief was entered in Debtor's bankruptcy case.  If it did not terminate then, the Letter Agreement terminated upon the closing of the sale of Debtor's assets during Debtor's bankruptcy case.

18.     Clinton Walker ("**Walker**") was designated by Clarity as the representative of Clarity to serve on the CSM Board.

19.     David J. Richards ("**Richards**") was designated by Empire as the representative of Empire to serve on the CSM Board.

20.     Defendants, through their respective designated representatives Richards and Walker, violated their contractual and fiduciary duties to Debtor in connection with numerous

matters, including but not limited to, blocking financing, conspiring to prevent conversion of a multi-million dollar secured loan to equity, and wrongful foreclosure. The particulars of which are set forth in Adversary Proceeding No. 18-02064.

21.     The actions taken by Richards and Walker in their capacity as members of the CSM Board were directed and controlled by Empire and by Clarity, respectively. To the extent that the actions described in this complaint were taken by Richards and Walker in a capacity other that as members of the CSM Board, such actions were either directed and controlled by Empire and by Clarity, or are chargeable to Empire and Clarity, respectively by virtue of the relationship between Richards and Walker and Defendants and the status of Richards and Walker as the designated representatives of Empire and Clarity.

**C.     Defendants Are Insiders Of Debtor**

22.     Defendants qualify as insiders of Debtor.

23.     Plaintiff is informed and believes that Walker owns and/or controls Clarity Copper, an affiliate of Debtor, and that Walker owns and/or controls Clarity.  Accordingly, Clarity is an insider of Debtor by virtue of being an "affiliate, or insider of an affiliate, as if such affiliate were the debtor" under 11 U.S.C. §101 (2)(B) and (31)(E).

24.     Plaintiff is informed and believes that Richards owns and/or controls SMI, an affiliate of Debtor, and that Richards owns and/or controls Empire.  Accordingly, Empire is an insider of Debtor by virtue of being an "affiliate, or insider of an affiliate, as if such affiliate were the debtor" under 11 U.S.C. §101 (2)(B) and (31)(E).

25.     Even if Defendants are not explicitly within that definition of insiders, their relationship to Debtor is sufficiently close that they are insiders as defined in 11 U.S.C. § 101(31).

D.     **Debtor's Management**

26.     Prior to the Involuntary Petition Date, the business and affairs of Debtor were managed by and under the direction of the CSM Board, of which Defendants controlled two out of the three members - Richards and Walker.  Richards and Walker also served on, and as, the board of managers of SMP, the majority member of Debtor.

27.     The CSM Board appointed a management team to assist with the day-to-day operations of the Debtor.  As of the Involuntary Petition Date, Debtor's senior management team included David McMullin ("**McMullin**"), President and Chief Executive Officer, and others.

28.     Following the closing of the Sale, the CSM Board appointed and designated, pursuant to Debtor's Limited Liability Operating Agreement, Peter S. Kravitz of Province Inc. and McMullin as Debtor's Wind Up Designees for purposes of winding up Debtor's business and affairs through a plan of liquidation and Kravitz/Province as Debtor's Chief Liquidating Officer (the "**CLO**").  Following the appointment and designation of Mssrs. Kravitz and McMullin, the members of the CSM Board resigned from the CSM Board, and Mssrs. Kravitz and McMullin are charged with winding up Debtor's business and affairs.  As a result, Richards and Walker no longer serve on the CSM Board.

29.      Richards is the founder of David J. Richards, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**WUMI**").  WUMI was managed by three individuals: Robert Lautz ("**Lautz**"), controlling three manager positions; and Richards and Walker, each controlling one manager position. Lautz represents WUMI majority member St. Cloud and Walker represents WUMI minority member Clarity Copper.  Richards represented WUMI minority member David Richards, LLC ("**Richards, LLC**").

30.     Richards and Walker resigned as WUMI board members on May 26, 2016, and July 27, 2016, respectively.   Richards, LLC also divested its equity interest in WUMI in mid-2016.  Clarity Copper still has an ownership interest in WUMI.

**E.      CS Mining's Prepetition Debt Obligations**

31.     Prior to this bankruptcy proceeding, CSM was indebted to several different lenders, including, but not limited to: (a) SMP; (b) WUMI; and (C) Noble Americas Corp. ("**Noble**")/Waterloo Street Limited ("**Waterloo**").   Indeed, CSM's prepetition debt obligations included loans held by SMP (the "**SMP Loan**"), loans from WUMI (the "**WUMI Loan**"), and a loan from Noble, subsequently acquired by Waterloo (the "**Noble/Waterloo Loan**").

1.     **The SMP Loan**

32.     On November 10, 2011, CSM, as borrower, and SMP, as lender, entered into a Joint Loan Modification Agreement (together with amendments thereto, the "**SMP Loan Agreement**") whereby CSM and SMP agreed to modify the terms of certain debt instruments previously issued by WUCC and CKMC, which SMP acquired and CSM assumed in connection with CSM's purchase of assets in the WUCC and CKMC bankruptcies (the "**SMP Loan**").

33.     In connection with the SMP Loan, at the time of the SMP Loan Agreement, SMP held a security interest in substantially all of CSM's assets.  Pursuant to a Debt Subordination Agreement dated August 10, 2012 (the "**SMP/WUMI Subordination Agreement**"), SMP agreed to subordinate its payment, debt and lien rights in connection with the SMP Loan to WUMI's debt and lien rights under the WUMI Loan.  In addition, two years later, pursuant to an Intercreditor and Subordination Agreement dated August 12, 2014, SMP agreed to further subordinate its payment, debt and lien rights under the SMP Loan Agreement to Noble's debt and lien rights under the Noble/Waterloo Loan.

2.    **The WUMI Loan**

34.    On August 10, 2012, CSM, as borrower, and WUMI, as lender, entered into a Loan and Security Agreement (the "WUMI Loan Agreement"), subsequently amended from time to time. Pursuant to the terms of the WUMI Loan Agreement and subsequent amendments, WUMI agreed to lend money to CSM to fund operations and/or make capital investments subject to an interest rate of 12.5% per annum.    The WUMI Loan Agreement, in conjunction with the SMP/WUMI Subordination Agreement, also gave WUMI a senior lien over substantially all of CSM's assets.

3.    **The Noble/Waterloo Loan, The Intercreditor Agreement, And The Tenth Amendment To The WUMI Loan**

35.    On or about August 12, 2014, in a continued effort to obtain needed financing, CSM, as borrower, secured a $30 million loan from Noble, a Delaware corporation conducting business in Utah, pursuant to a Loan and Security Agreement (together with the amendments thereto, the "**Noble/Waterloo Loan Agreement**"). Noble, which is in the business of marketing and distributing energy, metals, and mineral products, including copper, agreed to provide financing to CSM in large part because of its interest in securing warrants in SMP and copper supply agreements with CSM. CSM and Noble (and to some extent, WUMI) memorialized their respective obligations in connection with the Noble/Waterloo Loan into four Agreements: (i) the Noble/Waterloo Loan Agreement; (ii) an Intercreditor Agreement between CSM, Noble, and WUMI (the "**Intercreditor Agreement**"); (iii) a Copper Concentrate Sales and Purchase Agreement (the "**Concentrate Agreement**"); and (iv) a Copper Cathode Sales and Purchase Agreement (the "**Cathode Agreement**" and together with the Concentrate Agreement, the "**Supply Agreements**").

36.     The Noble/Waterloo Loan Agreement required Noble to loan to CSM $15 million initially, and a second $15 million (for a total of $30 million) if and when CSM was able to raise $15 million in matching equity financing (the "**Matching Equity Financing**"). Under the Intercreditor Agreement, and as an inducement to Noble to provide CSM with the funds under the Noble/Waterloo Loan Agreement, WUMI agreed to subordinate certain of the liens it held against CSM's assets to Noble's liens, while retaining a senior lien on certain other assets.

37.     In addition, pursuant to the Intercreditor Agreement WUMI agreed that it would convert its remaining debt into equity in SMP once Noble advanced the full $30 million it was committing to lend CSM under the Noble/Waterloo Loan Agreement, thus reducing CSM's debt burden and freeing CSM's assets from WUMI's liens.   WUMI understood that its promise to convert was an inducement for Noble to enter into the Noble/Waterloo Loan Agreement.

38.     Section 5.2 of the Intercreditor Agreement provides that in the event that "Noble loans [CSM] the [$30 million] pursuant to the Noble/Waterloo Loan Agreement, and there are no existing defaults under the Noble/Waterloo Loan Agreement or that occur in connection with lending the [$30 million], [WUMI] agrees to promptly (but in any event within 5 business days) convert [its loan] in full into equity of [SMP], pursuant to the terms of the [Richards] Loan Agreement . . . . In connection with such conversion, the [WUMI Loan Agreement] obligations will be extinguished [and] all [l]iens held by [WUMI] on [c]ollateral shall be released."

F.     **Events After The Funding Of The Noble/Waterloo Loan**

39.     On August 12, 2014, concurrently with the execution of the Noble/Waterloo Loan Agreement, the Intercreditor Agreement, and the Supply Agreements, Noble funded the initial $15 million of funding.   CSM then took steps to secure the $15 million in Matching Equity Financing that would trigger CSM's ability to access the second $15 million tranche of Noble financing and

WUMI's corresponding obligation under the Intercreditor Agreement to convert its debt into equity and release its liens.

40.     On March 10, 2015, Noble began funding the second $15 million tranche by providing CSM with $3.75 million of funding.   That same day, WUMI and CSM's CEO, McMullin, executed the Tenth Amendment to Loan and Security Agreement dated as of March 10, 2015 (the **"Tenth Amendment"**), which purported to modify the WUMI Loan Agreement by prohibiting CSM from drawing down more than $29.75 million under the Noble/Waterloo Loan Agreement without first notifying WUMI and obtaining WUMI's consent and approval.

41.     The Tenth Amendment enabled WUMI to prevent CSM from drawing down the full $30 million, thereby forestalling WUMI's obligation to convert its loan into equity and release its liens under the Intercreditor Agreement.   Notably, the Tenth Amendment to the WUMI Loan Agreement, unlike the prior nine amendments, was not approved by all three members of CSM's Board.   Indeed, Richards and Walker chose not to obtain the consent of Cooper, the Chairman of the CSM Board, before directing McMullin to sign the Tenth Amendment, which McMullin did.

42.     Richards, who was a member of WUMI and at the same time a member of the CSM Board, who was placed on the CSM Board by Empire, led the negotiations with respect to the Tenth Amendment.   Upon information and belief, Richards caused McMullin to execute the Tenth Amendment even though Richards and Walker had not sought approval from Cooper as to all of its terms, nor informed Cooper that the proposed Tenth Amendment would place a cap on CSM's ability to draw down the Noble/Waterloo Loan.   Upon information and belief, Richards and Walker did not inform Cooper of all of the terms of the Tenth Amendment prior to its execution because they intended for the Tenth Amendment to benefit themselves and WUMI at the expense of Debtor and other creditors.

43.     On April 15, 2015, due to ongoing difficulties in obtaining Matching Equity Financing from CSM's members, the parties amended the Noble/Waterloo Loan Agreement a second time to again extend the deadline for obtaining Matching Equity Financing.  On or about April 24, 2015, PacNet, Clarity, and SMI entered into a Membership Unit Purchase Agreement to provide the Matching Equity Financing by purchasing additional equity interests in SMP in the amount of $15 million. The $15 million in funding, once provided pursuant to the Membership Unit Purchase Agreement, would enable CSM to obtain the full second $15 million tranche of funding under the Noble/Waterloo Loan Agreement.

44.     By June 4, 2015, CSM's members had invested a total of $15 million in SMP pursuant to the Membership Unit Purchase Agreement.  Thus, as of June 4, 2015, CSM had satisfied the condition in the Noble/Waterloo Loan Agreement that it obtain $15 million in Matching Equity Financing in order to obtain the second $15 million tranche of Noble financing. Noble therefore provided CSM with additional funding, and as of July 8, 2015, Noble had provided CSM with $29.75 million of the $30 million of the funds available under the Noble/Waterloo Loan Agreement. The remaining $250,000 available on the Noble/Waterloo Loan Agreement was not drawn down in 2015 even though Cooper advocated for the draw down and the Debtor desperately needed the cash.  Waterloo, after it purchased the Noble/Waterloo Loan from Noble, provided CSM with the remaining $250,000 on February 3, 2016.

**G.     The Relevant Agreements**

45.     CSM is governed in accordance with the Operating Agreement. Pursuant to Section 5.1 of CSM's Operating Agreement, the business and affairs of CSM are to be managed by the CSM Board.

46.     At all relevant times, the CSM Board consisted of Richards, Walker, and Cooper. Richards was placed on the CSM Board by Empire, and Walker was placed on the CSM Board

by Clarity.  Pursuant to the Letter Agreement, Defendants effectively controlled the CSM Board,

by virtue of Defendants' appointment of Richards and Walker to the CSM Board on behalf of

Defendants.

47.    Under the Letter Agreement, Defendants were retained to provide or cause to be

provided, as mutually agreed by Defendants and the CSM Board, service on, and advice to the

CSM Board and CSM's management regarding corporate and financial strategy, potential

acquisitions and divestitures, the financial management of CSM and other initiatives (**"Defendant**

**Services"**).

48.    Under Section 5.1(g) of the Operating Agreement, at all relevant times, Richards

and Walker, who were appointed to the CSM Board by Defendants each owed "a fiduciary duty

to the Company and the Members that was the same as the duty that a director of a Delaware

corporation owes to a corporation and its stockholders . . . ."  Thus, Richards and Walker (and

Cooper) each owed CSM and its members the common law fiduciary duties of care and loyalty.

49.    Defendants failed to fulfill their obligations to CSM under the Letter Agreement,

by, among other things, failing to provide competent Defendant Services, and appointing directors

who breached their fiduciary duties and other obligations to CSM.

H.    **CSM's Operating Strategy And Plans – The Floatation Mill (Phase I) And The Agitated Leach Facility (Phase II)**

50.    Following its purchase of WUCC and CKMC's assets, CSM embarked on its two-

part business plan: (i) optimize and restart operations of WUCC's existing flotation mill (the

"**Flotation Mill**" or "**Phase I**"); and (ii) construct a state-of-the-art agitated leach processing

facility designed to maximize recovery of oxide copper ore via an agitated leach circuit and counter

current decantation processing circuit (the "**Agitated Leach Facility**" or "**Phase II**").

51.     The CSM Board authorized and approved CSM's two-part business plan, and was aware, at all relevant times, that implementation of Phase II of the project was necessary to CSM's ongoing business and operations.

52.     Shortly after acquiring WUCC and CKMC's assets on November 14, 2011, CSM began to implement Phase I of the project, including seeking to optimize and restart operations of the Flotation Mill.

53.     CSM's plan was to have the Flotation Mill up and running in ninety days.  Due to various operational setbacks, it ultimately took about a year to fully restart the Flotation Mill.  In the meantime, copper prices decreased, and CSM was not able to extract the volume of copper that it had anticipated.  As a result, CSM was not able to earn the revenue it expected to earn during Phase I, and it was accordingly not able to fully fund Phase II using Phase I revenues, as it had planned.

54.     Although CSM was able to complete construction of the Agitated Leach Facility, due to significant liquidity constraints, lack of funding, and delays in constructing the floatation mill, CSM was not able to capitalize on the benefits of its state of the art Agitated Leach copper production capabilities.  Without a further infusion of cash through either equity or loans, CSM's bankruptcy became inevitable.

## IV.

## DEFENDANTS, RICHARDS, AND WALKER, PREVENT WUMI'S
## CONVERSION OBLIGATION FROM BEING TRIGGERED TO CSM'S PERIL

### A.     CSM'S Liquidity Crisis

55.     In the second half of 2015, CSM continued to face ongoing liquidity and cash flow issues.  By the summer of 2015, CSM's management had put Defendants, Richards, and Walker, on notice that a substantial cash infusion was needed urgently to complete construction of the new

processing facility. At that time, but for the Tenth Amendment, CSM would have drawn down the remaining amount of the Noble Loan, and WUMI would have been required to convert the WUMI loan to equity of SMP.

56.     The Noble Loan Agreement required that CSM complete the new facility by November 30, 2015, and that CSM begin to make payments under the Noble Loan starting in October 2015, which CSM did not have the ability to do.

57.     Plaintiff is informed and believes and thereon alleges that at or about this time, Defendants, Richards, and Walker, knew that if CSM did not get an infusion of cash to complete the processing facility, it would default on the Noble Loan.

58.     Plaintiff is informed and believes and thereon alleges that Defendants, Richards, and Walker, knew that a default under the Noble Loan could relieve WUMI of its obligation to convert its debt to equity.

59.     Plaintiff is informed and believes and thereon alleges that because of their financial interest in the WUMI Loan, Defendants, Richards, and Walker, wanted WUMI to avoid its conversion obligation so that WUMI's secured, senior position with respect to CSM's assets would be preserved.

60.     Plaintiff is informed and believes and thereon alleges that in furtherance of this goal, Defendants, Richards, and Walker, took action to prevent CSM from receiving new financing, including but not limited to the following:

a.     Without full Board approval, Defendants, Richards, and Walker, directed McMullin to cause CSM to enter into the Tenth Amendment, which prevented the conversion of the WUMI Loan to equity, and thus inhibited the ability of CSM to obtain new financing.

b.      Defendants, Richards, and Walker, rejected a proposal for an $8 million equity investment in SMP that PacNet submitted in September 2015, to the detriment of CSM.

c.      In October 2015, Defendants, Richards, and Walker, rejected a second proposal from PacNet that would have provided a much needed $2.6 million equity investment and a $6 million loan.

d.      In late October 2015, Defendants, Richards, and Walker, rejected a third proposal from PacNet, for a $22.4 million equity investment and a $10 million secured loan.

e.      Defendants, Richards, and Walker, ultimately did accept a financing proposal offered by PacNet in late November 2015, but by that time the Noble Loan deadlines had passed and it was too late avoid a default on the Noble Loan.

f.      By rejecting needed financing, Defendants, Richards, and Walker, created conditions for a possible default by CSM on the Noble Loan, consistent with their plan to prevent WUMI from having to convert its loan to equity, to the detriment of CSM.

## B.      Noble Transfers Its Loan To Waterloo

61.      As CSM continued to struggle financially, Noble was experiencing its own financial difficulties and accordingly began exploring the possibility of selling its loan.

62.      In fact, in November 2015, Noble sent a letter to CSM identifying "Events of Default" related to the Noble Loan Agreement and, among other things, reserving its right "to sell or assign" the Noble Loan Agreement to "one or more Eligible Assignees without the consent of the Company."

63.     WUMI, through Defendants, Richards, and Walker, engaged in dialogue to acquire the Noble Loan, which Defendants, Richards, and Walker, concealed from CSM, and in particular, Cooper.

64.     At this same time, Waterloo, through Cooper, was also engaged in dialogue to acquire the Noble Loan, which Cooper and Waterloo concealed from CSM.

65.     On December 30, 2015, Noble sent another letter to CSM again identifying "Events of Default" related to the Noble Loan Agreement and, among other things, reserving its right "to sell or assign" the Noble Loan Agreement to "one or more Eligible Assignees without the consent of the Company."

66.     On December 31, 2015, Waterloo acquired the Noble loan. Specifically, Waterloo, which is owned and controlled by Lippo China Resources Limited ("**Lippo**"), entered into a Purchase and Sale Agreement under which it acquired Noble's interests and assumed Noble's obligations under the Noble Loan Agreement and the Intercreditor Agreement.

67.     Waterloo notified CSM of its acquisition of Noble's interests on or about January 7, 2016.

**C.     Drawing Down Of The Noble Loan And WUMI's Failure To Convert**

68.     On February 3, 2016, CSM drew down the last installment under the Noble Loan Agreement, bringing the total amount loaned to CSM under the Noble Loan Agreement to $30 million, which draw required WUMI to convert its debt into equity and release its remaining liens. This is what WUMI, through Defendants, Richards, and Walker, had attempted to avoid.

69.     On February 4, 2016, Waterloo (having acquired the Noble Loan) sent a letter to CSM agreeing to waive any defaults that might have existed as of that date, in order to compel WUMI's conversion of its debt into equity and release its remaining liens.

70.     As of February 4, 2016, Noble/Waterloo had fulfilled the obligation to fully fund $30 million, and no defaults existed as described in Section 8.01 in the Noble Loan Agreement, as any events of default that may have existed had been waived by Waterloo.

71.     Thus, under the Intercreditor Agreement, WUMI was obligated to convert its debt into equity and release its remaining liens by no later than February 11, 2016.

72.     Despite being obligated to convert its loan into SMP equity and to take steps to release its liens, WUMI refused to do so.

**D.     WUMI's Improper Enforcement Actions**

73.     Not only did WUMI refuse to convert its debt into equity and release its remaining liens, but also it sent an Enforcement Action Notice Letter declaring its intent to take Enforcement Action, as defined in the Intercreditor Agreement.

74.     On February 29, 2016, WUMI's attorneys sent a letter purporting to accelerate all moneys CSM allegedly owed to WUMI pursuant to the WUMI Loan Agreement.

75.     Then, on April 11, 2016, WUMI filed "Notices of Default and Election to Sell" (the "**Notices of Default**") with respect to CSM's real property and mining interests.  The Notices of Default state that they are intended to permit WUMI to seize CSM's assets and subject them to foreclosure sale under Title 57, Chapter 1, of the Utah Code.

76.     The real estate and mining claims subject to WUMI's threats of foreclosure were carefully selected and acquired by CSM because they hold valuable and unique mineral deposits.  Indeed, among the properties on which WUMI had threatened to foreclose was a parcel CSM needed to construct a new "tailings pond" to deposit the rock and process effluents that are generated by its processing plant.  Without a place to deposit these materials, CSM would not be able to continue its ore processing operation once the capacity of its existing "tailings pond" was exhausted.

77.     Similarly, the water rights and equipment that WUMI had threatened to seize were both vital to CSM's business.  CSM needed access to water to be able to run its operations.  Water is used as an essential element at various stages in the refining process.  The ball mills on which WUMI held liens were central to its processing operations.  Without them, CSM would not be able to process copper ore into a commercially viable product.

78.     Plaintiff is informed and believes and thereon alleges that WUMI's conduct as outlined herein violated Section 5.2 of the Intercreditor Agreement, pursuant to which the liens previously held by WUMI should have been released, and that WUMI's conduct, directed by Defendants, Richards, and Walker, caused damages to CSM.

79.     On April 5, 2016, Waterloo filed a complaint against WUMI to enjoin WUMI's collection efforts.  Similarly, on May 18, 2016, Lippo affiliates and SMP members, DXS and PacNet, filed a complaint against WUMI, and nominally against SMP and CSM, to enjoin those same collection efforts.

80.     On April 12, 2016, counsel for PacNet and DXS wrote to Richards and Walker in their capacity as members of the CSM Board and designees of Defendants to demand that CSM take action to enjoin WUMI from following through on its threats, but they each failed and refused to do so, instead choosing their own economic interests over CSM's.  Defendants knew about this demand but failed and refused to take any action, instead choosing their own economic interests over CSM's, and failing to provide competent Defendant Services to CSM pursuant to the Letter Agreement.

81.     Despite earlier promises to take action to prevent WUMI's threatened unlawful conduct, Defendants, Richards, and Walker, did nothing, thereby choosing to allow WUMI to take

action to foreclose on CSM's assets, to the detriment of CSM, and for the benefit of WUMI, and by extension, Defendants, Richards and Walker.

82.     Plaintiff is informed and believes and thereon alleges that, Defendants, Richards, and Walker, affirmatively agreed that Defendants, Richards, and Walker, should take no action so that WUMI could pursue its own interests at the expense of CSM.

83.     In the wake of Defendants', Richards' and Walker's, failure to act, on May 18, 2016, Lippo affiliates and SMP members, DXS and PacNet, filed a complaint against WUMI, and nominally against SMP and CSM, to enjoin those same collection efforts.

**E.     CS Mining Declares Bankruptcy**

84.     Due to, among other things, the self-interested actions undertaken by Defendants, Richards, and Walker, WUMI's failure to convert its debt to equity and release of its liens on CSM's property, WUMI's improper attempts to enforce its liens thereafter, CSM's financial struggles continued throughout 2016 and ultimately led to the filing of the involuntary bankruptcy petition.

**F.     Defendants' Claims in Debtor's Bankruptcy Case**

85.     Defendants filed several proofs of claims and claims for recovery of alleged administrative expenses incurred post-petition.[1]  Those claims are as follows:

    1.     **Clarity's Claims**

86.     On February 15, 2017, Clarity filed Proof of Claim Number 20011 ("**Claim No. 20011**") in the sum of $392,692.49, stating the basis of the claim as "Contract/Executory Contract" (presumably referring to the Letter Agreement).

---

[1] The Trustee reserves the right to assert and file additional objections to these Proofs of Claims, or any others which may be filed by Defendants, separate from this adversary proceeding.

87.     On September 26, 2017, as Docket No. 946, Clarity and Walker collectively filed an administrative expense priority claim pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2) (the **"Clarity Administrative Claim"**), in the sum of $199,623.00, stating the basis of the claim as "all unpaid post-petition amounts due and owing for advisory related services rendered by Walker during the course of this bankruptcy proceeding."

88.     On May 11, 2018, Clarity filed Proof of Claim Number 201 (**"Claim No. 201"**) as a claim based upon the purported rejection of the Letter Agreement, in the sum of $4,141,666.67. Claim No. 201 in part duplicated Claim No. 20011 as to the sum of $341,666.67 asserted in both claims based on the Letter Agreement, and adds asserted indemnity claims totaling $3,800,000.

### 2.     Empire's Claims

89.     On February 16, 2017, Empire filed Proof of Claim Number 20015 (**"Claim No. 20015"**) in the sum of $683,333.33, stating the basis of the claim as "Contract/Executory Contract" (presumably referring to the Letter Agreement).

90.     On May 11, 2018, Empire filed Proof of Claim Number 200 (**"Claim No. 200"**) as a claim based upon the purported rejection of the Letter Agreement, in the sum of $4,483,333.33. Claim No. 200 in part duplicated Claim No. 20015 as to the sum of $683,333.33 asserted in both claims based on the Letter Agreement, and adds asserted indemnity claims totaling $3,800,000.

91.     Plaintiff is informed and believes and thereon alleges that the claims asserted by Defendants, and each of them, are based upon their activities and conduct constituting gross negligence and willful misconduct, and for these reasons, Defendants are not entitled to any claims, including and claims for indemnification, against Debtor.

### G.     Summary of Alleged Conduct Engaged in By Defendants

92.     Defendants appointed Richards and Walker to the CSM Board, who breached their fiduciary duties of loyalty and care owed to CSM, and failed to comply with their obligations under

the Letter Agreement.  Indeed, Section 5.1(g) of CSM's Operating Agreement provides that Managers each have "a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders . . . ."

93.    Plaintiff is informed and believes and thereon alleges that Defendants, Richards, and Walker, breached their fiduciary duties to, and violated the terms of the Letter Agreement with, CSM when they engaged in the following conduct:

a.    Causing CSM to enter into the Tenth Amendment to the WUMI Loan Agreement which purported to limit CSM's access to necessary capital absent WUMI's consent and approval;

b.    Preventing CSM from drawing down the remaining $250,000 available under the Noble/Waterloo Loan;

c.    Causing McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker intended for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

d.    Rejecting multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

e.    Failing to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

f.    Failing to authorize legal action to block WUMI from improperly foreclosing upon CSM's assets, and affirmatively authorizing WUMI to do so even though

Richards and Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets;

g.      Taking actions during the bankruptcy case that effectively restricted the appointed Chief Restructuring Officers of Debtor from taking actions in the best interests of Debtor's estate, as described in that certain *Memorandum Decision Denying Motion To Approve Settlement* [Docket No. 793];

h.      Taking actions during the bankruptcy case to benefit Defendants, Richards, Walker, and WUMI, to the detriment of Debtor (*see id.*);

i.      Undermining the CROs' authority to ensure that Debtor's sale process was advantageous to Defendants', Richards', and Walker's self-interest, to the detriment of Debtor's and Debtor's estate's interests; and

j.      Failing to take appropriate steps to ensure that CSM would not be exposed to substantial penalties in connection with WARN Act penalties and related damages (the **"WARN Act Damages"**) which resulted when CSM terminated its employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert defenses to the WARN Act Damages.

94.      As a consequence of Defendant's failure to avoid WARN Act Damages and to take any action to avoid such damages, CSM was deprived of the ability to assert certain otherwise valid defenses to WARN Act liability, which defenses would have mitigated the potential damages to be assessed against CSM in the WARN Act Litigation.  However, because those defenses were no longer available to CSM pursuant to the ruling of the Court, including the "Unforeseeable Business Exception" and the "Faltering Business Exception" (the **"WARN Act Defenses"**), WARN Act Damages were imposed upon CSM.

95.     As a result of Defendant's failures, a class action lawsuit was filed by these terminated employees against CSM seeking liability and imposing damages and penalties in a sum in excess of $1,100,000 (the **"WARN Act Litigation"**).  The WARN Action Litigation was ultimately settled by the parties after an adverse ruling against CSM.  CSM was legally unable to assert the WARN Act Defenses, which would have otherwise provided a legal basis for mitigation of the WARN Act Damages alleged against CSM in the WARN Act Litigation.

## FIRST CLAIM FOR RELIEF FOR BREACH OF CONTRACT AGAINST DEFENDANTS

96.     Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1- 95, inclusive, as if set forth herein.

97.     The Letter Agreement constituted a contract between Defendants and Debtor.

98.     Defendants breached multiple obligations imposed upon them by the Letter Agreement.  Defendants were obligated to provide Defendant Services to Debtor, but failed to provide Defendant Services within the contemplation of the Letter Agreement.   Instead, Defendants, by and through their respective designees Richards and Walker:

a.     Caused CSM to enter into the Tenth Amendment to the WUMI Loan Agreement which purported to limit CSM's access to necessary capital absent WUMI's consent and approval;

b.     Prevented CSM from drawing down the remaining $250,000 available under the Noble/Waterloo Loan;

c.     Caused McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker intended

for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

      d.      Rejected multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

      e.      Failed to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

      f.      Failed to authorize legal action to block WUMI from improperly foreclosing upon CSM's assets, and affirmatively authorized WUMI to do so even though Richards and Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets;

      g.      Took actions during the bankruptcy case that effectively restricted the appointed Chief Restructuring Officers of Debtor from taking actions in the best interests of Debtor's estate, as described in that certain *Memorandum Decision Denying Motion To Approve Settlement* [Docket No. 793];

      h.      Took actions during the bankruptcy case to benefit Defendants, Richards, Walker, and WUMI, to the detriment of Debtor (*see id.*);

      i.      Undermined the CROs' authority to ensure that Debtor's sale process was advantageous to Defendants', Richards', and Walker's self-interest, to the detriment of Debtor's and Debtor's estate's interests; and

      j.      Failed to take appropriate steps to ensure that CSM would not be exposed to WARN Act Damages which resulted when CSM terminated its employees without

sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert defenses to the WARN Act Damages.

99.     As a direct and proximate cause of Defendants' breaches of the Letter Agreement, Debtor suffered damages.

## SECOND CLAIM FOR RELIEF FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS

100.    Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1- 99, inclusive, as if set forth herein.

101.    Implied in the Letter Agreement is a covenant of good faith and fair dealing;

102.    Defendants, by and through their respective designees Richards and Walker, breached the implied covenant of good faith and fair dealing by failing to provide Defendant Services to Debtor in a competent or fair manner.   Any services purportedly provided by Defendants to Debtor were for the sole benefit of Defendants, to the detriment of Debtor.   For example, any Defendant Services purportedly provided for the benefit of Debtor was actually designed to protect and enhance Defendants' interests to the detriment of Debtor.

103.    Defendants, by and through their respective designees Richards and Walker:

a.      Caused CSM to enter into the Tenth Amendment to the WUMI Loan Agreement which purported to limit CSM's access to necessary capital absent WUMI's consent and approval;

b.      Prevented CSM from drawing down the remaining $250,000 available under the Noble/Waterloo Loan;

c.      Caused McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker intended

for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

d.    Rejected multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

e.    Failed to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

f.    Failed to authorize legal action to block WUMI from improperly foreclosing upon CSM's assets, and affirmatively authorized WUMI to do so even though Richards and Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets;

g.    Took actions during the bankruptcy case that effectively restricted the appointed Chief Restructuring Officers of Debtor from taking actions in the best interests of Debtor's estate, as described in that certain *Memorandum Decision Denying Motion To Approve Settlement* [Docket No. 793];

h.    Took actions during the bankruptcy case to benefit Defendants, Richards, Walker, and WUMI, to the detriment of Debtor (*see id.*);

i.    Undermined the CROs' authority to ensure that Debtor's sale process was advantageous to Defendants', Richards', and Walker's self-interest, to the detriment of Debtor's and Debtor's estate's interests; and

j.    Failed to take appropriate steps to ensure that CSM would not be exposed to WARN Act Damages which resulted when CSM terminated its employees without

sufficient written notice, thereby exposing CSM to substantial penalties in excess of

$1,100,000, as well as the loss of the ability to assert defenses to the WARN Act Damages.

104.     As a direct and proximate cause of Defendants' breaches of the covenant of good

faith and fair dealing implied in the Letter Agreement, Debtor suffered damages.

### THIRD CLAIM FOR RELIEF FOR

### BREACH OF FIDUCIARY DUTY

### AGAINST DEFENDANTS

105.     Plaintiff repeats and re-alleges each of the preceding allegations set forth in

paragraphs 1 – 104, inclusive, as if set forth herein.

106.     At all pertinent times, pursuant to the Letter Agreement, Defendants

designated/appointed Richards and Walker, respectively, to the CSM Board.  As such, Defendants

were, in effect, managers of the CSM Board and/or controlled Walker and Richards as managers

of the CSM Board.  As such, Defendants owed CSM the fiduciary duties of loyalty and care.

107.     Section 5.1(g) of the Company's Operating Agreement provides that Managers

each have "a fiduciary duty to the Company and the Members that is the same as the duty that a

director of a Delaware corporation owes to a corporation and its stockholders  .  .  .  ."

108.     Plaintiff is informed and believes and thereon alleges that Defendants, Richards,

and Walker, and each of them, breached the fiduciary duties they owe to CSM by, *inter alia*:

a.     Causing CSM to enter into the Tenth Amendment to the WUMI Loan

Agreement which purported to limit CSM's access to necessary capital absent WUMI's

consent and approval;

b.     Preventing CSM from drawing down the remaining $250,000 available

under the Noble/Waterloo Loan;

c.      Causing McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker intended for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

d.      Rejecting multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

e.      Failing to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

f.      Failing to authorize legal action to block WUMI from improperly foreclosing upon CSM's assets, and affirmatively authorizing WUMI to do so even though Richards and Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets;

g.      Taking actions during the bankruptcy case that effectively restricted the appointed Chief Restructuring Officers of Debtor from taking actions in the best interests of Debtor's estate, as described in that certain *Memorandum Decision Denying Motion To Approve Settlement* [Docket No. 793];

h.      Taking actions during the bankruptcy case to benefit Defendants, Richards, Walker, and WUMI, to the detriment of Debtor (*see id.*);

i.      Undermining the CROs' authority to ensure that Debtor's sale process was advantageous to Defendants', Richards', and Walker's self-interest, to the detriment of Debtor's and Debtor's estate's interests; and

j.    Failing to take appropriate steps to ensure that CSM would not be exposed to WARN Act Damages which resulted when CSM terminated its employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert defenses to the WARN Act Damages.

109.    Plaintiff therefore seeks a judgment declaring that Defendants have breached their fiduciary duties to CSM and awarding damages against Defendants in favor of Plaintiff in an amount to be proven at trial.

<u>FOURTH CLAIM FOR RELIEF FOR</u>

<u>EQUITABLE SUBORDINATION OF CLAIMS OF</u>

<u>DEFENDANTS</u>

110.    Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1 – 109, inclusive, as if set forth herein.

111.    Plaintiff is informed and believes and thereon alleges that the Defendants, and each of them have engaged in inequitable conduct which has caused injury to Debtor and its creditors such that it is consistent with 11 U.S.C. § 510(c) for equitable subordination of all of the claims alleged and asserted against Debtor by Defendants, including Claim No. 20011, Claim No. 201, Claim No. 20015, Claim No. 200, and the Clarity Administrative Claim.

112.    Plaintiff is informed and believes and thereon alleges that all of Defendants' claims should be subordinated because Defendants, and each of them, have engaged in misconduct which is indubitably "inequitable" and as alleged herein above, including but not limited to breach of fiduciary duty.

113.    Plaintiff is informed and believes and thereon alleges that, as "insiders" of CSM, Defendant and each of them, engaged in conduct that was unfair, including but not limited to, *inter*

*alia*:

      a.      Causing CSM to enter into the Tenth Amendment to the WUMI Loan Agreement which purported to limit CSM's access to necessary capital absent WUMI's consent and approval;

      b.      Preventing CSM from drawing down the remaining $250,000 available under the Noble/Waterloo Loan;

      c.      Causing McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker intended for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

      d.      Rejecting multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

      e.      Failing to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

      f.      Failing to authorize legal action to block WUMI from improperly foreclosing upon CSM's assets, and affirmatively authorizing WUMI to do so even though Richards and Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets;

      g.      Taking actions during the bankruptcy case that effectively restricted the appointed Chief Restructuring Officers of Debtor from taking actions in the best interests

of Debtor's estate, as described in that certain *Memorandum Decision Denying Motion To Approve Settlement* [Docket No. 793];

h.      Taking actions during the bankruptcy case to benefit Defendants, Richards, Walker, and WUMI, to the detriment of Debtor (*see id.*);

i.      Undermining the CROs' authority to ensure that Debtor's sale process was advantageous to Defendants', Richards', and Walker's self-interest, to the detriment of Debtor's and Debtor's estate's interests; and

j.      Failing to take appropriate steps to ensure that CSM would not be exposed to WARN Act Damages which resulted when CSM terminated its employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert defenses to the WARN Act Damages.

114.      Accordingly, Plaintiff seeks equitable subordination of all of the claims of Defendants to all other claims in CSM's estate and postponing any repayment of Defendants' claims until such time as the other claims in CSM's estate have been satisfied in full.

**FIFTH CLAIM FOR RELIEF FOR**

**DISALLOWANCE OF CLAIMS OF DEFENDANTS**

115.      Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1 – 114, inclusive, as if set forth herein.

116.      The Clarity Administrative Claim should be disallowed for the following reasons:

a.      The Letter Agreement terminated as of the Involuntary Petition Date, such that, Clarity was never authorized to provide Defendant Services to Debtor after the Involuntary Petition Date, and is not entitled to claim any sums in connection with any Defendant Services allegedly provided to Debtor after the Involuntary Petition Date.

b.      Clarity failed to provide any services to, or based on any agreement with, the Debtor in Possession under the terms of the Letter Agreement.

c.      Any services provided by Clarity did not provide any benefit to Debtor or Debtor's estate.  Instead, Clarity's misconduct was detrimental to Debtor and Debtor's estate.

d.      To the extent the Letter Agreement had not terminated, Clarity breached the Letter Agreement during the course of this bankruptcy case and is not entitled to receive any compensation pursuant to the Letter Agreement.

e.      Defendants were never authorized by the Court to provide Defendant Services to Debtor.  Indeed, as a result of deadlock among the CSM Board, and due to the CSM Board's inability to function, Debtor employed at the estate's expense, Chief Restructuring Officers in order to provide the same services to Debtor contemplated under the Letter Agreement; the CSM Board was deadlocked and dysfunctional during Debtor's bankruptcy case; the involvement of Defendants, by and through their respective designees Richards and Walker, disrupted and harmed Debtor's operations, management, and bankruptcy estates.

117.    All of Defendants' claims, including the Clarity Administrative Claim, Claim No. 20011, Claim No. 201, Claim No. 20015, and Claim No. 200, should be disallowed for the following reasons:

a.      Defendants' gross negligence and willful misconduct in connection with failing to provide Defendant Services under the Letter Agreement caused harm to Debtor, such that, Defendants should not recover any sums or be entitled to any claims under the Letter Agreement;

b.      As discussed above, Defendants breached the Letter Agreement in multiple respects;

c.      As discussed above, Defendants breached the covenant of good faith and fair dealing implied in the Letter Agreement;

d.      Defendants failed to provide Defendant Services in a competent manner;

e.      Defendants breached fiduciary duties owed to Debtor;

f.      Defendants waived the right to any compensation under the Letter Agreement.  No advisory fees were paid by Debtor under the Letter Agreement after 2013.  After 2013, there was no expectation of payment on the part of Defendants, any purported right to payment was waived, and any services provided by Defendants to Debtor were provided on a voluntary basis with no expectation of or right to payment.

118.    Accordingly, Plaintiff seeks disallowance of all of Defendants' claims.

**WHEREFORE**, Plaintiff respectfully requests for the Court to enter judgment in favor of Plaintiff and against Defendants, and each of them, as follows:

A.      Declaring that Defendants breached the express terms of the Letter Agreement and entering judgment against Defendants in an amount according to proof at trial;

B.      Declaring that Defendants breached the covenant of good faith and fair dealing implied in the Letter Agreement and entering judgment against Defendants in an amount according to proof at trial;

C.      Declaring that Defendants aided and abetted Richards' and Walker's breaches of their fiduciary duties to CSM and entering judgment against Defendants in an amount according to proof at trial;

D.      Awarding damages to CSM for each of the wrongs alleged against Defendants in an amount according to proof at trial;

E.      Awarding attorneys' fees, legal costs, and other expenses incurred by Plaintiff against Defendants, and each of them, in an amount according to proof at trial;

F.      Subordinating the claims of Defendants to all claims in CSM's estate and postponing any repayment of Defendants' claims until such time as the other claims in CSM's estate have been satisfied;

G.      Disallowing Defendants' claims in their entirety; and

H.      Granting any other further relief that the Court deems just and proper.


Dated:  July 25, 2018                    **LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**


                                 _____/s/ Martin J. Brill_____
                                 Martin J. Brill
                                 Philip A. Gasteier
                                 Beth Ann R. Young
                                 Krikor J. Meshefejian

                                 **SNELL & WILMER L.L.P.**
                                 David Leta
                                 Jeff Tuttle


                                 *Counsel for Plaintiff Liquidation Trust of CS Mining, LLC*